Katie, for 18S5192, Alcresta Therapeutics, Inc. and Alex Azar, II, Secretary of Health and Human Services. Alcresta Therapeutics, Inc. Good morning. My name is Stephanie Webster. I represent the plaintiffs and their challenge to the coding decision for reliable organs. Even according to the government, the coding process under the Health Insurance Portability and Accountability Act, or HIPAA, is supposed to entail the grouping of like items to facilitate the efficient processing of medical claims. But the coding determination at issue groups the new enzyme-packed medical device with unlike items, such as tubing and tape, and the standard enteral feeding supply kit with the code B4035. You say the coding decision at issue, which is the 2017 decision for 2018, right? Yes. The case has now changed pretty significantly in my view because we have a decision, we just got a decision a day or two ago ruling in your favor on the coding issue. There is now a separate code and you essentially have what you asked for. Well, respectfully, our belief is that that decision was not in our favor at all because the same categorization of our unique medical device with the standard supply kit continues. Your Honor is correct that the original determination challenge was this one made in late 2017. And since that time, the agency has made a series of changes to the coding, but none of those changes to the coding changed the connection that the agency has made between our code, excuse me, our product and the standard enteral supply kit. But, I mean, assuming that this recent decision will now govern and, you know, there's a loose end, they haven't technically applied this to the 2018 year yet, but assuming that all shakes out, what's left? It seems like what you're now complaining about is not the HIPAA code, but the indicator that's attached to it. Well, the code, the alphanumeric code, the B4035, not B4105, is part of the coding determination. That's the alphanumeric indicator, but the series of indicators are all part of the determination as to how to treat the product. There was a 4035 code for HIPAA purposes, and it lumped supplies together, and it treated your client's product as a supply, and you said that makes no sense. This device or whatever it is that mimics pancreatic function, it's just crazy to treat that like tape and syringes and stuff, and that has a lot of force to it. But the agency ultimately agreed with you on the HIPAA codes, because they've now said it's not 4035, there's a separate 4105 for this device, and it's now no longer treated as a part of the supply bundle. Well, Your Honor, the problem is that even though the agency has issued a different alphanumeric code, it continues to connect that code to the supply chain, and it's doing it through another indicator? Well, there's actually a brand-new indicator, which is effectively a cross-reference to the manual provision that governs the supply chain. So even though the agency has issued this new number and letters, but it's still making that connection of our product to the basic supply chain. But doesn't that just underscore the problem, in the sense that it seems like the parties are talking past one another? Let's say they got rid of the D and the double zero, but as a substantive matter, the agency still understands to be part of an internal feeding kit, and therefore take those codes away. The action that they're going to take as a substantive matter would still put it under the umbrella of internal supply kit. And if that's true, so it seems like, I mean, I don't think you dispute this. What you're really trying to get at is the substantive pricing determination. And the question is, have you shot at a false target by zeroing in on the code, rather than the underlying pricing determination? Well, the coding reflects a pricing determination, the entirety of the coding. Again, it's not just the alphanumeric indicator. I think one thing that highlights the problem we have here is that the code that was issued just Monday evening actually designates our product as a nutrient rather than a supply, but at the same time still tries to connect us to the previously priced, competitively bid supply kit. How can you tell it's a nutrient, because it's in the 4100 series? The V41 series is the series for nutrients, yes. And so it's deceiving, because it makes it seem like we've gotten what we've sought, which is characterization of our product as something other than a supply that's part of the standard kit that goes to all patients. You might have gotten what you sought, because what you sought was a unique billing code. And you did get a unique billing code. And then now it seems like what you want, and I understand why you want it, is a billing code that isn't encumbered by indicators that you dislike. And I totally understand why you'd want that. I'm not sure that's what you asked for, but it may be what you want. The question I have is, if this new billing code works in the way that the government says, which is to say that it enables appeals through the normal administrative process that would allow you to attack the underlying substantive determination that Relizorb should be part of the bundle, then there is that opportunity to make the argument that ultimately really matters both to you and, I think, to the government through that channel. Well, with respect to the administrative review process, the government has not ever said that plaintiffs have an ability to challenge the coding determination through that process. We can ask them that to confirm that. And just to be sure I'm understanding, so you're saying the coding determination, but really what matters is whether, as I understand it, really what matters to you is whether Relizorb is treated as part of the same bundle for which there's the daily cap. If it's not treated as part of the same bundle for which there's the daily cap, then it creates the possibility that there's going to be a greater reimbursement. It doesn't create the certainty, but it creates the possibility that there's going to be a greater reimbursement. So what really matters to you is the opportunity to decouple Relizorb from the bundle. And if that opportunity exists through the administrative appeal process, and we can confirm that with the government, but if that opportunity does exist through the administrative appeal, then you at least have the chance to make the argument that ultimately you really care about. Am I understanding you correctly? Your Honor, there is no ability to achieve the decoupling, as you called it, through the administrative process. And the Medicare Appeals Council, which is the highest level adjudicant body in the Medicare appeals process, has said that that council and the ALJs are bound by CMS's assignment of the codes. And that's in the INRAE RMM case data on page 14 of IRIPS libraries. There is no ability... Of the indicator codes? Excuse me? Of the indicators of that I or D that's appended to the HIPAA billing code? Right. The indicators are part and parcel of the coding determination. Correct. So, I mean, that's one thing I'm puzzling over. When I look at the 4035 versus 4105, that's pure HIPAA. Billing codes, we know what the standard is. We understand how the government's changed. What do you think they are doing when they attach the indicator, as opposed to the HIPAA code? Are they making a legally binding judgment under Medicare, or is this just the HIPAA team giving some ultra-virus advice about what might happen on the Medicare side of things? They're making a coding determination that is infected with agency views about coverage and payment. And there's a sentence in the government's brief that I think confirms that. On page 15 of the government's brief, the government says, HIPAA codes are simply an administrative mechanism for CMS to implement existing Medicare coverage and payment rules. They are making coding determinations that reflect their views on coverage and payment, and then claiming that we cannot dispute that coding determination because what we are really disputing is payment and coverage when they're all intertwined. What you just read makes it sound like they're saying that the indicator is simply a repeating and confirmation of a Medicare payment decision that's been independently and previously made. Well, Your Honor, the decision hasn't been previously made. The only determination that has been made and released by the agency is the determination as to how the product is going to be treated for how it's going to be coded. And again, that includes all the different indicators that are attached. And if it's helpful, there is a joint subject dispute. There was a back and forth between the parties about the duplication. There's some part of the manual that deals with duplicative codes. And maybe you can point me to the language because I'm not able to find it right now. But as I read that language, it indicated that there was an opportunity to challenge the fact of duplication, which would seem like the kind of challenge that you want to make, which is to say it's not duplicative for relies or to be submitted for reimbursement because it should be treated as something different. And it shouldn't be treated as part of the bundle. And if that's what I call decoupling, I don't know if that's real. Your Honor, there's a manual provision cited in Sanctus Brief 30 and 43 that provides that if a claim is denied as a duplicate, then there cannot be an appeal right. No, but then it goes on to say unless what's being challenged is the fact of duplication. That's how I read it. And we can ask the government that. But if that's what that says and it sounds like, that's exactly the kind of challenge that you want to bring, which is to say it shouldn't have been treated as duplicative because it shouldn't be treated as part of the same bundle. It should be treated as something different for reimbursement purposes. Your Honor, the only reason there is, there are other provisions of the regulations that the government has not engaged on that provide that to the extent that there is a challenge to a payment determination or a categorical payment determination over which CMS has full responsibility, that there is no right to appeal that. That's found in 42 CFR section 405926, which is the section that excludes certain items from the definition of initial determinations that can be appealed. Well, let's suppose, so it seems like there's a fight about whether it can be appealed. Let me just make sure I'm understanding it correctly. Let's suppose that the government says there is the ability to raise the kind of challenge that you want to raise, which is through the administrative process, which is that we don't think relies or should be treated as part of the same bundle. It should be given its own code and also all the accoutrements that come along with its own code, which is to say it gets separate reimbursement. Let's suppose that that's true. I know you just did that, but let's suppose that's true. If that's true, does that satisfy you, or do you think that there's something different about this other way that you could get a different treatment, which you've introduced, which is this kind of gap-filling notion, which is that seems different from the normal administrative appeal process because it goes to, I think it goes through a different process. And that may be another way to get the same thing, which is a determination of whether it relies or should be part of the same bundle. Your Honor, the only reason that a supplier or beneficiary, like Scientist Lab, even has any ability to pursue the administrative claims process is because this court issued an emergency injunction. In advance of the issuance of the injunction, there was no right to appeal because all claims were rejected. But I thought the point of the new code that we got on Monday is that it equates it with the code that because of a hurt. It's definitely true that it came about as a result of what we said, but it equates it with that code in the sense that it gives rise to an appeal possibility through the administrative process. Well, that's what the government's 28-J letter suggests, but the only means through which appeal rights were accomplished was through a special instruction that the agency issued just after this court issued an emergency injunction. But now they've issued a permanent code that they say operates the same way. That's right, but whether there's a temporary code, Your Honor, or a permanent code, there's still the problem of all the regular Medicare rules governing administrative appeals. Just to clarify, I just want to make sure I understand what you're saying. So, our panel said that based on HHS's representation, that 42 CFR 405.926C would not bar an appeal, that the special panel understood that it would not. Is it your position that but for that order, the ordinary operation of HHS would bar? Yes, that's my position. But for that order, there would be no right to appeal whatsoever for suppliers and beneficiaries. And with respect to Alcresta, a manufacturer, there is absolutely no right to pursue that administrative claims process whatsoever. They're not defined as a party. That system is designed to review claims submitted by suppliers on behalf of beneficiaries or beneficiaries. And there are significant... I assume that provision, that 42 CFR 405.926C, is not something akin to a subject matter jurisdiction limit. Right. Now that the government has made this representation, judicial estoppel or something like it will kick in as to that potential bar. I don't believe that whatever explanation the government gave in the context of the briefing on our emergency motion would bind them. Why wouldn't it be judicial estoppel unless that requirement were jurisdictional? Well, that requirement is... That regulation is jurisdictional as to the agency adjudicators. I mean, the 405.24 of the 42 CFR defines... Looks like something more like a preclusion of review than a subject matter jurisdiction. I don't know. We're slicing and chopping. I guess preclusion of review would be a jurisdictional problem as well. The statute, going back to the statute, defines initial determinations or requires that the secretary provide a process for the review of initial determinations and test for certain parameters and the regulations implement that. There is no preclusion of review provision per se, but that definitely constrains the ability of those adjudicators to review that kind of determination. Can I just get back to this question just so I make sure I understand your position before we go to the government? I know you dispute whether the beneficiary can take the kind of appeal that seems to me that matters, which is the kind of appeal that allows the argument to be made that relies or should not be treated as part of the bundle for reimbursement purposes. I know you dispute that, but let's just assume that the government says, no, in the administrative appeal process the beneficiary can make that argument and then someone's going to have to make a determination. The agency's going to have to decide whether it relies or is part of the bundle. Does that satisfy you or do you think that there's still a problem? There is still a problem from our perspective because it is very challenging for a beneficiary to even get to the point of being able to appeal. We have a coding determination that indicates to the whole industry that Medicare is not going to pay for this product. Therefore, suppliers don't want to furnish this product. Patients, physicians don't want to prescribe the product because they don't expect that it will be covered and they don't want to lead these vulnerable patients down the path of trying to get a product that they're never going to be able to afford. The point is that you may never have a beneficiary who's in a position to make use of the administrative process. Right. We have one beneficiary. In this case, there's one. It was very difficult to get the supplier to furnish that product to the beneficiary based on the supplier's understanding that it would need to be filing a claim for an item that was not going to be reimbursed. I want to emphasize as well that El Presta, as a manufacturer, doesn't have any independent ability to pursue that administrative claim process even if it would have the motivation to do so. If this were not a product that was coded as part of the kit preexisting, what is the process? Does the manufacturer ordinarily have an ability to participate in a pricing determination and appeal if it disagrees with the pricing determination? What is that process? A manufacturer doesn't ever have a right to pursue that administrative claims appeal process. Right. The one that they're referring to is the one for FLAC. I'm not getting the coverage I should get. What I'm saying is there. If they hadn't sort of funneled everything into this coding determination, you have a new product and it's not even susceptible of being grouped under something that's a preexisting code. You get a code that's unique. And what is the ordinary course of establishing and or disputing the pricing? The ordinary. It's not a whole sort of course. Well, this is the ordinary course for disputing such a determination. This being what? A court action challenging the decision. We don't even see a pricing decision. We've seen a pricing decision, a coding decision. In your view, as I understand it, we've seen a pricing decision masquerading as a coding decision. And that creates a whole level of complication. So I'm trying to give you a hypothetical in which the pricing decision is not masquerading as a coding decision. It is a pricing decision. Where does that happen and where does that get appealed? Well, there are no pricing, separate pricing decisions that are made by the agency that are independent of coding determination. I thought the whole gap, your argument about gap filling was this other route. I thought that was your argument is that there's this gap filling mechanism under which even a manufacturer can raise this claim. And that's a different route from the administrative appeal process that the government is referring to. That is correct. The gap filling, to clarify, in that situation, the Medicare contractor would be making a determination of price using the gap filling process because there had been no price previously set through the fee schedule in the competitive bidding process. As a new product, ReliGorb, if treated properly, would be priced by the Medicare contractor using appropriate data regarding charges until such time that it could be brought into the competitive bidding process and priced through the agency's regular course. A new product should not, arguably, it should not be priced this way. It should go through that contractor process. Always, I mean, it's called gap filling. And it seems like it's kind of backing into and provisional. But if your product came online at a time when it wasn't mid-year, I mean, as I understood it, the work group does the coding and CMS does the pricing. So there actually are two separate, am I wrong, two separate determinations? Well, I think there's a little ambiguity about the exact process. But there are the coding process. The coding is done by the work group that is comprised of people outside the agency and people within the agency. And of those people within the agency, there are pricing experts who are on the work group. And so I think that there is interplay between the pricing folks at the agency and the work group, if that answers your question. But that's the information that I have as to how it works. If there were no gap fill provision, if that just wasn't a method, and your product was not a product that was grouped under the umbrella of daily and general feeding supply kit, who would make the pricing decision and what would we look to in terms of? If there were no gap filling. Yes. Provision. Yes. Well, I think if there were no, well, there is one. But if there weren't one, the contractor would have to make that determination because the product wouldn't have a price already set. But there's reference to this competitive method. Right. And that's the contractor. No, the competitor's bidding is done nationwide for a product such as enteral nutrition products. Right. So what happens is that codes are set, and then for each code, for each product or set of products or bundle of products, the competitive bidding is done. Not by the work group. Not by the work group. That's done by the agency. The competitive bidding is done, and then the results of that competitive bidding are reflected in notice and comment rulemaking. Right. And so payment rates are set for each of the bundled items. Right. And there's a statutory provision, 1395W3, I think, which says with regard to this kind of enteral nutrients equipment and supplies, there's supposed to be competitive bidding, and then based on that bidding, the secretary determines payment amounts. Right? That's how it's done on the payment side. And the problem that we have here is that competitive bidding was done for the supply kit under B4035. And then RELIZOR came along. RELIZOR was not among a part of the set of products that were competitively bid. But the position of the government, nonetheless, is that even though it wasn't part of that bundle, when actually the existing payment rules would require it to be treated as a new product, and there is language in the rulemaking that says that you don't add a product to the bundle later, and then the gap filling occurs. So why, for putting aside the gap filling, if you now have a code, is there, and it doesn't have a price associated with it. Right? So if, is there another cycle when competitive bidding is going to happen, and how do we know that this will not be competitively bid at that time? We know because of the D and the double O codes, right? Well, there is supposed to be another cycle. I don't have, the government may have more information than I do about when that next cycle will be. But in the interim, this gap filling provides the interim. I'm going to put the interim aside because I understand that the gap filling might be particularly advantageous to a firm in their position. And it might be because it's kind of like they take the pricing that you're asking. So I'm trying to understand the ordinary regulatory process as opposed to the provisional gap So the question there is, if you were keyed up to be priced in that regular process that's competitive, what would be the appeal rights resulting from that? Would you be able to, would be a final rule and you'd be able to appeal whether it's arbitrary purchase the way they priced you or? Oh, if the, if we were competitively, if we were part of the competitive bidding. Yeah. If we were part of the competitive bidding, then we would pursue a challenge to the rule establishing the rate based on that competitive bidding. But the last competitive bidding was done in 2016. So what do you do with, again, under that statute, there seems to be an obligation to do competitive bidding for nutrients, equipment, supplies, right? So once you get this separate code to follow down Judge Pillard's decision tree, right, there should now in theory be an obligation on the secretary to do competitive bidding with respect to this new product that has its new code. And as far as I can tell under B5, that gets done and a price gets established. The secretary establishes a reimbursement amount based on that bidding. And then on the question of review, there's this B12 provision which says no administrative or judicial review of the establishment of payments under B5, which is the competitive bidding provision. So I would think your answer is once the competitive bidding pricing is in place, you're precluded from challenging that under this 1395W3B12. Well, I'm confident that the government would assert arguments that we would be precluded from review. I think we would have arguments to get around that preclusion of review. And what do we do? So how does that impact? You know, I can think of an argument that that just underscores the precise and reticulated nature of all of the Medicare review scheme and the fact that you should be proceeding under it. I can think of an argument that, well, if you can't get, you're going to be precluded from review anyway. You should be able to do this 1331 and run right now. Well, the problem is that even assuming that the agency is at some point in the future going to do competitive bidding, the code that they just issued on Monday connects us to the competitive bidding amount for B4035. Because it is still cross-referencing the provision governing payment for supply kits. We don't have any expectation that our new B4105 code would be separately competitively bid or priced. And that is the crux of the problem. Which takes us back to the question I asked you earlier. What is the legal status of an indicator determination that's associated with the code? And I frankly don't know the answer to that. But let me ask you one more question, which is we don't have the competitive bidding yet, so presumably the preclusion of review provision won't yet have kicked in. So what happens in the interim? What happens with respect to payment in the interim? Yeah. Well, as... Suppose there were no indicator code. We just, we got this new, we have this new 4105 and the people, the Medicare assistance contractor or administrative contractor said, okay, what do we do with this? If someone makes a claim for payment, how do they analyze it? There's no competitive bid in place yet, but there's a HIPAA code. How do they analyze it under the current state of affairs? Current state of affairs except assume hypothetically there's no indicator in the HIPAA code. Hypothetically there is no indicator. There's no I or D or anything. If there were, if we just had the 4105 and no indicators tying us to the supply kit, then they would follow the regular process for new products and do this gap filling. And you have your argument. And make a determination on medical necessity, because of course none of this is going to be covered unless the patient needs the product, and there is going to be a necessity set of that. We're not looking for categorical reimbursement. We're looking for access to a process of determining whether reimbursement is appropriate for a particular patient. So there would be the gap filling, looking at charges, either percentages taken off of charges, depending on the locality. There is a formula for determining that in the interim until we get to competitive bidding. That's something that Alcresta itself would do. That's not something that's dependent on a beneficiary or a provider. Well, that process, that would take place with respect to a beneficiary. A beneficiary would have to get a prescription for the product, and the supplier would furnish the product and then make a claim for the product. Alcresta still can't do any of that, but that would be the process. Oh, right. Make a claim for payment, tender a claim for payment. And if I might indulge in the joint appendix at page J8-300. I'm happy to share. Fine. Just tell me what it is. I'll probably know. It's a spreadsheet through which the agency announced the temporary code in April. And I refer you to it because I think it demonstrates that the coding determination is more than just the Office of American Care. We've got a whole bunch of letters and numbers and lots of different columns. I even tried to print out the one that was issued on Monday, and it's a really, really, really long spreadsheet. It's not even possible, or we would have copied that. It has these columns for COV and pricing, which are these- Right. It's all part of that determination. This is the HCPCS quarterly update reflecting the determinations of that work group made in April. If you're right that you just have the code, like the first column, without the indicator, on your theory, everything works fine. Someone can go through the Medicare scheme and make an argument that you think will be successful based on gap filling, at least until competitive bidding. Right. And medical necessity. Okay. So, that's premise number one. Premise number two is you've told us now in the actual world where we have not only the 9994 and 4105, but we also have these Es and Is and double zeros, everything grinds to a halt. Right. If both of those are true, it seems like what's going on is that the agency is sort of smuggling a Medicare determination into the HCFA coding decision. That's exactly right. Is that a fair characterization? That is the crux of the problem that we have here. That's your perspective. But isn't the upshot of that that we have to treat-the HCFA piece of the case is this 4105 code, and then there's a separate part of the case that's really a Medicare claim, which is to the I and the D and the double zero. But that's a claim arising under the Medicare Act, isn't it? Well, again, a prescient can't make such a claim. And the beneficiaries and suppliers can only make such claims as a result of this court's injunction. Okay. So, that's an argument that that piece of the case arises under the Medicare Act, but you can circumvent the Medicare scheme because you can't-I'm sorry. The assessor can't exhaust, and there are practical difficulties with individual patients' exhaust. Right. Under counsel for urological interest, correct. The manufacturers do not have access to that appeals process. But in terms of the beneficiaries, so I don't understand the point that it's only because of the injunction, because now that we have the permanent code, the beneficiary can still pursue the administrative rep. Right, but the permanent code with the indicator-the current situation is no different from the situation that we had over the summer with the temporary code. It's just that the permanent code, it used to be a temporary code. Yes. Now the problem is permanent rather than temporary. Right. But it's the same problem. Right. Well, there's a question of whether there's that problem because the government may think that the beneficiary can meet the kind of challenge that you're talking about. Well, again, in our view, after this court issued its emergency injunction, the agency was required to issue a special separate instruction to its contractors to explicitly direct them to issue initial determinations. And the reason for that is because under the normally operating rules, there would be no initial determination because this is treated as a duplicate claim. Right. And then there's the question of whether that fact of duplication can be challenged. I have one very technical question, which is with the indicators, the letters, the Ds and the Is and those things. So, one of the letters is a C. Yes. If the indicator were a C, that would be okay? That would solve the problem we have here, yes. Right. So, it's not that you need a code that doesn't have any indicator at all. It's that you need a code that doesn't have the wrong indicator from your perspective. Well, I think that under the HIPAA statute, coding should be separate from payment or reimbursement. In our situation, if we were to get a C, which would indicate that the contractors are supposed to determine pricing, then that would solve our problem. Yes. Okay. We'll hear from the government. Thank you. Good morning. Good morning. May it please the Court. Courtney Dixon for the government. The government absolutely thinks that this case arises under the Medicare Act, and it claims to be presented to the agency in the first instance as is the usual course, as is required by the Medicare statute. We have given a unique billing code. The coverage indicator... So, under your understanding of that administrative appeal process that you want, only the beneficiary can do that. Yes, Your Honor. Or a supplier. Or a supplier. Or a supplier, yes. But not the company. And that is, to go back to what I said to Pillar's earlier question, that is the usual course of business. Right. So, let's just hypothesize. Let's put to one side the potential problem that you may never have the practical situation of a beneficiary in a position to bring a claim. We can come back to that. But let's just assume that there is a beneficiary who seeks reimbursement, has it rejected, and then wants to appeal that. In that process, with the code that has now been given, can the beneficiary make the claim that it's wrong to treat Relizor as part of the same bundle? That is my understanding, Your Honor. I would point the Court to the technical direction letter that the agency issued when it changed the coverage indicator to D with the Q9994 code. The agency said with the coverage indicator D, it issues an initial determination that can... No, but I know it says it issues an initial determination, but it seems to me the problem is, and it just seems like every time we think there's an answer, there's a new code that gives rise to a potential problem. The question is the content of the review. Yes, Your Honor. And there I would point the Court to 42 CFR 405.924. Where is that? 445.924. And you said which part of it? D11, Your Honor. An initial determination includes any other issues having a present or potential effect on... Is that an appendix? I don't know if it's in the appendix, Your Honor, and I apologize. We cite it in our brief. Yes, okay. It's also in the Wilson Declaration, which is in the record and explains this. Your Honor, an initial determination includes any other issues having a present or potential effect on the amount of benefits to be paid under Part B of Medicare, including a determination as to whether there was an underpayment of benefits. Putting aside the concession that you made in the interlocutory litigation on appeal, why wouldn't review be barred by 926C, which says you can't get administrative review of the fee schedule established? Your Honor, my understanding of what that regulation is talking about is the publication of the fee schedule. You can't appeal directly from that. You have to present a claim to the agency. If you believe that you were underpaying in the context of a claim that you've been presented to the agency, you can proceed to the appeals process. But in the context of presenting the claim, which is what you usually have to do, you can attack not just the application of the regulation, but the correctness. You can attack the underlying regulation, which says this device will be classified in this way and produce this amount of... Your Honor, I don't think there's a regulation directly, obviously, speaking to relies or in this instance. I think what plaintiffs are complaining about is, again, it's been... Well, regulation, the rule, whether it's... If they're contesting that they're not supposed to be bundled in this supply payment because the agency has misclassified them, for some reason I believe that that would be an issue having an effect on payment, and if someone believes that they're being underpaid, and I want to be clear... I mean, there are a lot of Medicare contexts in which claimants are permitted to attack narrow, adjudicatory, computational sort of issues, but not the design of the reimbursement scheme. I'm just wondering if that is not the case here. Well, it's my opinion, Your Honor, that the claim was presented. You think it's not? I think that this one can be raised as to whether the agency would itself decide it. It could be raised. I mean, I guess it just seems like there's not a clear answer because it's... Here's the concern that I have, at least, is that if the claim is raised and then the answer that the agency gives is, there was no underpayment, and the question is, well, why wasn't there an underpayment? Well, because it's part of the bundle. Then it's sort of like, well, you haven't even missed the ball at all, and if that's the answer, that there's no underpayment, the claim is rejected because it's part of the bundle, then there is no meaningful opportunity to raise the argument that they want to be able to raise, and it seems like it ought to be able to be aired in some fashion, which is that it's just wrong to think of it as part of the bundle. Two responses to that, Your Honor. First, the Medicare statute does provide a process for expedited judicial review. If the parties think this is something that the agency doesn't have the authority... the review process doesn't have the authority to decide and there's no material facts in dispute, the agency can certify it for direct judicial review. That's a way to get into court. Direct judicial review of what? Of the authority of the agency to decide. I don't think we're at the point of questioning the authority of the agency. I think it has the agency in a reviewable way exercise its authority to decide, yes, this is part of the bundle, or no, it's not, and the grounds on which it decided, yes, this is part of the bundle, even though a whole list of other things relating to internal feeding aren't. Why this? And is that decision something that can be accessed? Not the general authority of the agency, not the general question of whether this is something covered by Medicare, but that question, where is that available? If a beneficiary believes that they've been underpaid in a claim of benefits, the Medicare Act requires that to be presented to the agency in the first instance, in the context of a contact statement. And then if someone says duplicative, what you're seeking under this code is covered under the kit. Done. I'm sorry, when you say duplicative, I want to be clear that that would be the ground on which they fear that plaque with the appeal would be denied. Your Honor, it may be the case that in the administrative review process, the agency says that the agency has correctly classified the item, but then either the appeals process will be exhausted, or plain distinct that this is something that can't be resolved in the appeal, there's a way to get to court. And that decision is exhausted, and then you come to court and challenge not the contents of the decision, but that the decision didn't include other things? It feels that the agency has sort of subliminally made, or sort of behind the scenes made a determination, and is playing a bit of a shell game, I think this is their claim, with how to get at that decision. And I'm just trying to get your answer. No, no, no, that's not what's going on. Here's the easy way to get at that decision. I just wonder what your, you know. Again, Your Honor, the Medicare Act requires claims to be presented to the agency in the correct instance. We're addressing these issues in the context of a context claim for payment, and we're not hypothesizing and disreporting a preliminary injunction motion, what claims might be raised. Because, again, we're here under the guise of a billing code challenge, and it's not a challenge to the billing code. It's a challenge to Medicare coverage and payment rules, as they're being applied to a precedent. And to the extent that, Your Honor, I guess there's not a lot in the record here on how a determination was made as to whether a precedent was applied, but I would point the court to JA-151 as the appendix. They mention an initial benefit category determination that the agency made. That kind of initial benefit category determination is something made by the relevant division at CMS in charge of those items. Here it was the Division of Durable Medical Equipment. And so this isn't something that's happening behind the scenes in a shell game, Your Honor. And, again, the Medicare Act requires challenges to be presented to the agency in the context of a concrete claim for payment. Where is the language about duplication? I guess I'd like to clarify what Your Honor means by duplication. There's somewhere, and I just can't place where in the materials it is, where it talks about denials of claims based on duplicativeness or duplication. And then it has a carve-out that says, but if it's the fact of duplication that's being raised, that can be presented. Where is that? It's by supplier. I think it's the Medicare Claims Processing Manual. Which section, Your Honor? I'm sorry. I know that under the duplicative claims, Your Honor, if we're referring to the B4035 code specifically, if there were two claims submitted for B4035 for the same day for the same patient, Medicare is only going to pay one of those, so the second one would be rejected. And then there's a question of what happens if someone wants to challenge that administratively. I mean, here, Your Honor, we've provided them a code in which they have a way to go through the agency on that code. So let's say, hypothetically, that Blass now has a code and he is denied reimbursement on the ground, that an effort to recover under the current code is duplicative of a recovery under B4035. As I understand it, the Medicare Claims Processing Manual in Chapter 20, Sections 30.7.2 and 110.5, says that when a claim is rejected as duplicative, that kind of decision is not appealable, except that a supplier, not a beneficiary but a supplier, who claims that a claim is not in fact duplicative, can get a determination from the durable medical equipment Medicare administrative contractor of that. Is that the course that you anticipate that a supplier needs to go through, and that's how this question is going to be teed up? I don't know the context of the supplier, Your Honor, and I apologize for not having that language in front of me. So in the context of a recipient like Blass, no review, because when it's rejected as duplicative, it's not appealable. No, Your Honor. Again, under Alcrest's code that was the Q9994 code or the B code that will be effective in January 2019, the agency has said it will result in an initial determination that either Mr. Blass or a supplier can appeal to the administrative review scheme. It's going to be an initial determination that, well, if the determination is duplicative, then unless you're making some special exception for this case, it wouldn't be appealable. Your Honor, I think that Alcrest's argument or Mr. Blass's argument at bottom is that they shouldn't be included in the bundle payment for supplies. Bingo! And where do they get to appeal that? And, Your Honor, I'm saying that that needs to be appealed in the context of a concrete claim for payment presented now under Reiser's new code, which you said, Your Honor, that would result in this initial determination, and then he can go to the agency and say in the context of that, I've been underpaid because I think that this needs to be paid. So, is the agency going to say, just like he came back and said, is the agency then just going to say, what are you talking about? It's duplicative. Or, what are you talking about? You haven't been underpaid. You got your $12 for that day. And, Your Honor, if they think that it, a couple of things, Your Honor. One, again, the Medicare Act requires claims to be presented to the agency in the first instance. Right, but then what's the answer going to be once they present it? Let's take it as a given that it's presented. Then once it's presented, what's the answer going to be? Is it going to be, sorry, it's duplicative. You reached the daily cap. What are you complaining about? Or, is it going to be, actually, this should be part of the same bundle. Do you know why it should be part of the same bundle? Because it's just like the other things that are part of the same bundle. Even though you say, you, the beneficiary or the supplier or whoever it is, says that it performs a unique function. We actually don't think it performs a unique function. Thereby teeing up the question that I think both you and the other side agree is rude. Again, Your Honor, I can't answer that question precisely because that claim hasn't been presented. It hasn't been attempted to present it. I don't know the precise nature of the argument that will be raised or what the agency's answer is. It seems unlikely to us that the latter kind of question is something that would typically be reviewed in an administrative review from a payment determination. That record is not going to be made there unless there's a whole category of these kind of claims that we're unfamiliar with. We are, again, to the extent that the agency wouldn't address it, and then there's the expedited access judicial review process. What would happen then? Let's play that out. Let's suppose what happens is there's an alleged underpayment, and the type of claim that you want to see brought is brought before the agency, and then the agency responds by just saying, I don't know what you're complaining about. Under our rules, under our understanding, it's people business. And then you're alluding to some expedited judicial review process. I'm not sure why exposition. Exposition is just about timing. So is your ultimate response that at some point it goes to court, and then this gets raised and litigated before a court, whether it should be part of the same bundle? It could be, Your Honor, if the administrative review process, if there's no facts in dispute, it's not something that's going to be resolved in the administrative review process. There's a process for getting it to court, but the central important point is that claims have to be presented to the agency in the first instance. Okay. The other, so let's say that the claim is presented. This is not duplicative. Please don't reject me as duplicative because it's an error that is categorized as part of the internal feeding supply kit. And the administrative person says, well, that's above my pay grade. I have to treat it that way because that's the decision that the agency has made about pricing, is that it is part of the internal supply kit. So then the individual tries to do, to seek review. And under the regulation, which our special panel suspended, the payment amount of program reimbursement, I'm quoting the regulation, the payment amount of program reimbursement for which CMS or a carrier has sole responsibility under Part B is not an appealable determination. So there's no administrative appeal of that. Your Honor, again, I think that the regulation that you're citing and referring to, Your Honor, is talking about the amount that's been competitively bid for something or the publication of a fee schedule. Again, it's a beneficiary. But the fee schedule here, though, your position, your agency's position, is there is a fee schedule applicable to this, and it's the daily internal supply kit.  Exactly. So any dispute over that, not appealable. I don't necessarily read the regulation that way, Your Honor. I don't think that someone can say, hey, the fee schedule amount, or I apologize if I'm being imprecise, it's not my understanding that someone would be precluded by that regulation from saying, I shouldn't be considered a supply in this bundle in the first place. So the upshot of where we are, the following, that everybody agrees that the relevant issue at root is whether it relies or should be considered part of the bundle. I think everybody agrees that. And then the upshot from the government perspective now is there's a requirement that you have to seek relief or underpayment before the agency. Whether you're going to be able to raise that thing that everybody agrees is at root there, I don't know. Maybe, maybe not. I'm not sure. But what you have to do is at least try to see whether we're going to give you an answer to that through the government process, through the administrative process. Is that where we are? And that may be where we are, and it may be that you're right that we have to be there. I have to say it's not terribly satisfying that the government can't tell us whether the issue that the government thinks is at root is, in fact, something that's going to be able to be aired in the administrative process. We're hearing a flaring injunction directly in this report purportedly about a billing code. Again, I think we all agree that the billing code is just not an issue here. To the extent that there are issues about coverage and payment, that's just not what this suit is about. And Clayton suggested earlier that this is the ordinary course. That's not true, Jordan. It would be quite extraordinary if someone could just file directly in this report and ask for a flaring injunction from the agency to change how they're reimbursing their product. That is not how this works. That's not what Congress specified. How is it that all these other things that are coded, you know, B4150, B4151, got coded, even though they also have to do with internal supply, feeding supplies, they didn't get coded in a way that put them under the umbrella of B4035 in the first instance? I cannot speak code by code. Some codes refer to formulas. Formulas are not supplied. There's different payment rules that apply to formulas. Well, I understand the pump feeding kit includes the two, but then, for example, there's B4084. Gastrostomy, jejunostomy, tubing, which is a different kind of tubing. So that's not under the umbrella. Your Honor, and maybe this will help clarify some other things as well. These codes, these codes are used by other insurers other than Medicare. So perhaps another insurer needs a separate code that Medicare does not need. Again, these are simply an administrative mechanism to help the efficient processing of Medicare billing. And the fact that we're here purportedly about billing codes, when in reality we're talking about coverage and payment, just shows that if this report was correct, that their suit is fundamentally disconnected from what they want in this case. So you're the expert. Are some of these things that have a different numeric code from B4035 nonetheless also, like as Alcresto was, treated as part of the daily B4035 allowance? I know that some other codes are not separately priced. They have the same 00 pricing indicator with the same D indicator. I obviously can't go code by code, and I would be getting out way too far in front of my team if I were to attempt to do so, Your Honor. But again, these are just for the efficient processing of claims. And for Medicare purposes, they help process the billions of Medicare claims that are received every year. There's a Medicare administrative review process for coverage and payment disputes. And if you were counseling Alcresto, if you were a new or a similar product and you came up with a product that you really thought was great and was distinct from anything previously priced, bring it on the market. You want to make sure that patients have access to it. What would be your step one in making a case to someone in the agency about the price that should be reimbursed for that? Your Honor, I guess in terms of how people might come to the agency, it's quite common in my understanding that as companies are developing products, they come to the agency to see, hey, are we going to be covered under Medicare? How we might be paid? Again, there's not a lot on the record here, but there is a reference to the fact that Alcresto, in fact, did that with the agency, and it was the Division of General Medical Equipment Policy that said, hey, we think you're a supply. But is there a formal way to make a record and submit an application for a price or anything like that that you're aware of? I personally can't speak to any. I don't know, and I think, again, Your Honor, the way that these things usually go in the ordinary course of business is that in the context of a concrete claim for payment, what do you think you're going to receive? No, no, it can't be that I've developed a product, and I'm not even going to know whether Medicaid is going to cover it until somebody buys it at some market price I've set and tries to get coverage for it. That can't be that the whole pricing starts that way. I understand that you're positioned on judicial review, but I'm stepping outside that and trying to understand how the agency operates with respect to pricing. Right, and as I mentioned, Your Honor, companies often come to the agency in the first instance. Alcresto has quite a lot of back and forth. That's what I'm talking about formally. I'm talking about formally sending applications for a price, How do you get into the competitive bidding mechanism? Well, Your Honor, competitive bidding is not in place everywhere in the country. There's only about 130 jurisdictions, I think, that have competitive bidding. And that's why there's a gap filling? No, Your Honor, and the gap filling is quite different. In the case of a newly covered product in which there isn't a fee schedule price or maybe there's not an equivalent price in the market, the CMS can instruct the contractors to gap fill and kind of fill in a price that's different from competitive bidding, Your Honor. And again, that's just not applicable here because under the agency's view, we have a price that we pay for items that are supplies for internal nutritional therapy. And so simply having a new code is not going to entitle you by itself to additional reimbursement. And that is the crux, essentially, of Plaintiff's argument here. Why hasn't this kind of thing ever come up before? It just seems odd. It seems like almost what's happened is that in every other situation, if something is, in fact, a separate product, it just gets a separate code and then nothing ever arises. This just seems like this kind of crazy situation in which something that seems, in a lot of respects, like it might, you know, perhaps substantively, shouldn't automatically be considered part of the bundle, nonetheless is considered part of the bundle.  Every product doesn't get its own billing code. There are groups of code that describes like items. And then what happens in those situations? Because this must come up. So what happens in those situations when someone wants to say, boy, I don't like the fact that I'm being grouped with a bunch of other things because it's compromising the extent to which I'm getting an economic return? And are you aware of any history of that kind of thing being raised, either through the administrative process or through gap-filling or any other mechanism for this type of dispute to be aired? Again, the difficulty here is that plaintiffs are tying together the, or I guess conflating the fact that, oh, I have a billing code and this is what the dispute is. To the extent that there is a need for a unique billing code, you can apply for that. We can have a fight about that over here. To the extent that that is a payment in coverage about the item, that's just under Medicare coverage and payment rules, and that is what goes through the agency. And to your point about you have a team meeting like this, again, this is not the ordinary course that these disputes happen. But then you would have thought that you're not able to give a definitive answer on whether even the administrative claims process allows for the airing of this because apparently there's no history of it being done through that process either. I can't give specifics, again, because we're here on a floating injunction motion about purportedly a billing code, and that's not how these claims are usually presented to the agency, and this is not how these fights usually take place. Do you know, have this kind of thing come before the agency from an underpayment review? Not that I'm aware of, Your Honor. I'm speaking for myself. Yes. There are no further questions, Your Honor. We think the district court was correct. There's a fundamental disconnect here between what plaintiffs have asked for in this floating injunction motion. I do have one question, which is I think there's a little bit of confusion about the regulation that says, the regulation I was stating before, 42 CFR 405.926C, that is about whether it is reviewable when CMS makes a payment amount determination, and a panel of our court said as a matter of provisional relief, based on a representation, perhaps it was by you, that that would not bar administrative appeal. Does that still apply to the new code, or was that just a kind of provisional for purposes of that temporary code? Is it your understanding that were Alcresta to try to appeal, or were Flack to try to appeal, he would not be barred by that provision? Your Honor, plaintiffs made the same kind of dispute about the regulations and what they would appeal in the context of that, of the context of their emergency motion that they're making here. And we made the same representation that under the regulation that I cited, Your Honor, 405.924B11, an initial determination would include an issue having a potential effect on the amount of benefits, and the .926 regulation that you cited, Your Honor, would not preclude that. Again, I think that regulation is referring, Your Honor, to things like appealing from the direct publication of a fee schedule, or things of that nature, Your Honor, not in the context of appealing a concrete claim for benefits and saying that you are underpaid. So do you have authority to represent to us that if we accept your position and then the inevitable challenge is brought through the Medicare scheme, that the government will not assert that 920, sorry, I don't have the provision, that preclusion provision? I don't know if I need to make an assertion of my authority here, Your Honor. I know that that's what we cited in our briefs, that's what we cited in our motions to the court, that's what we've said throughout this litigation. But what you can't say is the content of that. So it might be that this review is not precluded, but what you're not in a position to say is that the content of that review will include the question of whether it relies or should be considered part of the bundle. Again, Your Honor, because I would be speaking about hypotheticals for claims that haven't been even attempted to be presented. Well, I mean, it's not all that hypothetical when the last part of your brief tells us not to worry about any of this because all of this can be aired through the Medicare system, which applies only if there's channeling as opposed to preclusion. And Your Honor, the Medicare Act requires presentment and exhaustion, and we've said to the extent that they're disputing coverage and payment, Medicare Act requires... Unless exhaustion operates for one reason or another to eliminate review rather than delay it. I don't think we're there at this point, Your Honor, because there hasn't been even an attempt to present to the agency. We're here on a preliminary injunction relating to a billing code, and that's just not the right way to stop this. Can I just play it out? So let's suppose that there's no preclusion because review's available and that the beneficiary has access to that and that practically it's available for the beneficiary to do it, and then the beneficiary seeks review of an alleged underpayment, and then the agency says there's no underpayment because it's duplicative, and then the beneficiary tries to say, well, it shouldn't be duplicative because it should be segregated out. There should be separate reimbursement, and the agency says that's not what this process is all about. We've said it's duplicative. That's it. And then it goes off. Then what happens? Where and if that's the way things unfold, because we don't know that that's not the way things are going to unfold, so if that's the way things do unfold, where at some point is there an actual conjoining of the issues such that the agency is making a reviewable assessment of whether relies or should be considered part of the bundle? I don't know at what point precisely in the process that would happen. I would say to the extent that there's no material facts in dispute and this is something that the agency doesn't have the authority to resolve, there's an expedited process for judicial review, but again, the Medicare Act requires these things to be presented in the context of a concrete claim for payment, so the agency has a chance to apply its statutes and regulations in the first instance and consider these questions in the context of a concrete claim in which we're not here about its billing codes. Who made the determination that this product fits under B4075? Who and where did this determination make? That's not on the record. Again, I would point to the reference in it to an informal benefit category determination that a precipice was made by the agency. Those informal benefit category determinations are made by the decisions at the agency that are responsible for the product at issue, so here would be the durable medical equipment. And there's no documentation of the grounds for that? Again, because we're here reportedly about a billing code. I know. I can't imagine that the documentation about the grounds for that would be raised in an individual administrative review of an individual benefits file, but maybe it would be. I think that's my only remaining question. You have not addressed the other preliminary injunction factors. No, Your Honor, because the basis for a preliminary injunction is irreparable harm, and they haven't alleged irreparable harms that will be remedied by an injunction. It has indicated by the fact that we've given them the billing codes that they set out to establish. So if we were to disagree with you, then the other factors you don't dispute? Again, Your Honor, we think that the only thing the court needs to determine is that what plaintiffs are seeking here is just not connected to these irreparable harms that they've connected to their billing codes. And I think, again, as was indicated earlier, we're all in agreement that that's not the fight that we're having here. So the one way that we expect, to some extent, is likelihood of success on the merits is one criterion for PI, for preliminary injunction, right? And you're not contesting likelihood of success on the merits? Your Honor, it's not that we're not contesting that. We're saying the merits are before the district court. There's discovery ongoing in the district court with a summary judgment briefing. Well, not on the PI. Just on FACA, right? On the FACA, Your Honor. And in the context of the PI, there's no need to address any of that. Right. So I know that you think that there's no need to address it because you think you went on another ground. I'm just saying that for our purposes, we take it as a given that likelihood of success on the merits is actually established. And your argument is even though that may have been established, the government still wins. And I guess, at best, you don't disagree with that. Your Honor, the basis for preliminary injunction is always irreparable harm. And here, what plaintiffs are seeking is just not going to remedy their alleged irreparable harm. Right. So irreparable harm is a separate ground. So I just want to make sure that you agree with me. So the way we look at it is likelihood of success on the merits is something that we just assume to be vague because the government says that doesn't matter because of irreparable harm. We haven't briefed that here, Your Honor. And, again, we obviously contest the merits that's going on in district court. But for purposes of this report, we haven't briefed that. They're not entitled to a preliminary injunction because they haven't established irreparable harm. And for the merits, the underlying merits that we treat as for these purposes, just for these purposes, I understand you're just coordinating it off as you should. For these purposes, does the underlying merits include the underlying substantive determination of whether it relies or should be considered part of the bundle? No, Your Honor. That's absolutely not before the court in the context of this motion or this litigation. Again, that plaintiff is substituted by a billing code to the extent we're going to have a dispute about coverage and payment. The proper way to proceed, as the Medicare Act requires, is to the agency in the first instance. But they've been saying that they're entitled to a billing code because it's not part of the bundle. And so in some ways, the merits, the likelihood of success on the merits is the question of whether it should be part of the bundle. And what they're saying is it shouldn't be part of the bundle. Therefore, you ought to give us a separate billing code that kind of manifests that underlying merits determination. Your Honor, I think, I mean, the confusion there, obviously, is that we've given them a billing code. Our whole point is that what they're actually fighting, it's kind of hard to see what that is in the context of this billing code dispute. Again, to the extent that they've established irreparable harms, it's just not caused by the billing code as indicated by the fact that we've given them a unique code. And so everything else, Your Honor, the Medicare Act requires the code of the agency in the first instance. Can I just ask, what does the government understand itself to be doing when it, having established the code itself, then puts on it these indicators, the coverage and pricing indicators? Your Honor, those coverage and pricing indicators are an administrative mechanism for conveying information to Medicare administrative contractors. It's purely payment, right? It's not a HIPAA code. It's a Medicare payment instruction. Those reflect existing Medicare coverage and payment rules, as we explained in our brief. Does the indicator have independent legal significance to bind the contractors, or is it simply an advisory restatement of preexisting Medicare law? I don't know the answer to that, Your Honor. I can, again, just emphasize that they reflect existing Medicare. I think the likely answer is when you go to the contractor and present the claim for payment, the contractor is going to deny it in a second and say, Code B. Your Honor, if they're not separately pricing or Medicare, that's a function of Medicare coverage and payment rules, which presumably we're all looking at the same coverage. Well, I'm just saying it may be a function of this indicator determination, which I'm just having a hard time understanding. I don't see any statutory or regulatory authority for it. It seems to be a Medicare payment decision that's somehow mysteriously appearing in the context of a HIPAA coding decision. The billing code is the other column. Right, the first column.  That's HIPAA. That's HIPAA. That's independent of Medicare decisions. As to that column, I'm with you on regressibility. That's not what's bothering me. What's bothering me is the right-hand columns, which seem to be separate acts of administrative authority that seem Medicare-focused and seem to have legal significance in and of themselves. My answer, Your Honor, would be that for Medicare purposes, that's for Medicare claims processing that's reflecting existing Medicare coverage and payment rules. To the extent there's a dispute about those rules and whether they're being applied properly, I think that's for the Medicare Administrative Review Scheme. Thank you. Okay, thank you, counsel. We'll give you two minutes for rebuttal. Thank you. To judge Taylor's question, the determination was made in the letters sent to APRESTA in 2017, which is in the joint appendix at day 189. The no existing payment rule or other rule dictates the categorization of the license of the supply kit. I want to just make that clear. And the whole problem is that the agency did the cross-reference to the supply kit as part of its coding determination. I'm sorry. Say that again. The no existing payment rule or supply rule? Well, the government's position for APRESTA is that there's some existing payment rule that somehow drives the decision to categorize the license of the supply kit, but they haven't cited any rule that requires that treatment. They've decided it's a supply and a plus. We know what the answer will be from the Medicare contractor if a claim is submitted, because we have one. And the answer was that the benefit for this service is included in the payment allowance for another service procedure that has already been adjudicated. And I will translate that into this is a duplicate claim. Payment for this bundle has already been made. And was that appealed? That is the claim determination that has been appealed. It has just recently been appealed, so we don't know exactly how that's going to play out. But I do want us to hear in the most recent decision, we're getting some mixed signals from the government. On the one hand, we're getting the indicator code, which seems to say that for reimbursement purposes, they still regard this device as part of the supply bundle. On the other hand, we're getting a coding decision that seems to suggest that someone in CMS, for some purpose or another, now thinks that this really isn't a supply. It's something different. They say to give it a nutrient code. I think those mixed signals, Your Honor, highlight the arbitrariness of this decision. But it might highlight the difficulty of our trying to jump in here at this stage and figure out what is going on with these indicator codes in an arguably abstract context where we don't have something that feels like a concrete payment dispute. Well, respectfully, this dispute is very real to our precedent that's lost millions and millions of dollars based on this decision. Judge Srinivasan had asked a question about what happens normally. Normally, if there's a new product, the manufacturer goes and gets a code, and the code is seen as a path to reimbursement. What has happened that is very unique here is that the manufacturer got a code that categorized it with items it shouldn't be categorized with and, therefore, stood in the way of reimbursement. And that's just not happened before? It seems like that's something that could have happened other times, too, and then someone would have had a dispute about whether it was appropriate to code it so that it's part of a preexisting reimbursement calculation. Well, I think that, as you might imagine, manufacturers are reluctant to sue the agency, especially when the agency is consistently taking the position that what it's doing is not reviewable. And this is, for the reason I just stated, a rather anomalous situation. But there are also some questions about how this would play out, and I refer you back to that Medicare Appeals Council case that's cited on page 14 of our brief, the NRA RMM case. And in that case, the Medicare Appeals Council decided that it couldn't decide arguments that were being made about the fact that the product belonged in one code versus another because it said that CMS is exclusively responsible for assigning uniform national definitions of codes. That's an indicator code. Right, the HCPCS codes, right. And in that language, that sole responsibility is the language that is used in the regulation 405926 that we've been discussing, where the 405926 talks about the inability to challenge a payment determination for which CMS has sole responsibility. I offer that as an example of how this would play out if the appeal is allowed to progress. Under the regulations, a rejection of a claim because it's a judicial claim would not progress, and there is no expedited judicial review in the situation where that occurs with a claim. If there aren't any further questions. This, the letter that you pointed up to 189 to 190, it basically says that CMS believes the abusing code describes this product and it talks about how private insurers aren't bound. And then it says for Medicaid purposes, please contact the Medicaid agency in the state in which the claim is being filed. Can you, or should I ask the government, do you have any idea what that's referring to? Have you done that? I believe the government's position, which doesn't square with reality, but their position is that they're making the code and other insurers can just do whatever they want with the code and pay whatever they want to pay with the code and process claims however they want. The reality is that Medicare is the leading, is leading the charge. It's setting codes and the rest of the industry is looking back. And so I think this means if you want to know how it's going to be covered under Medicaid, contact Medicaid. But in reality, most Medicaid programs are following Medicare. And so there is an answer out there in the market. Hopefully that answers your question, Your Honor. I guess so. Yeah, I mean, I understand that they're saying the private is separate and that may or may not be, but then it says for Medicaid systems, please contact the Medicaid agency in the state. And I just wondered what contact them for what and what way. Is that referring to some kind of redress or avenue? No, Medicaid programs across the country would use the code set by the agency in the work group under HIPAA. Thank you, counsel. Thank you, counsel. The case is submitted.
judges: Srinivasan, Pillard, Katsas